UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| META PLATFORMS, INC., A DELAWARE CORPORATION,<br><br>　　　　Plaintiff,<br><br>　　v.<br><br>THEM NGUYEN, et al.,<br><br>　　　　Defendants. | Case No. 21-cv-05002-TSH<br><br>**REQUEST FOR REASSIGNMENT WITH REPORT & RECOMMENDATION RE: MOTION FOR DEFAULT JUDGMENT**<br><br>Re: Dkt. Nos. 32, 33 |

## I.　INTRODUCTION

Meta Platforms, Inc.[1] alleges Defendants Thêm Nguyễn, Lê Khang, Nguyễn Quốc Bảo and Phạm Hữu Dung took control of user accounts on Facebook and used those accounts to run millions of dollars of ads on Facebook without the victims' knowledge or consent. Meta brings this action for injunctive relief to stop Defendants' conduct in violation of Facebook's Terms of Service. Pending before the Court is Meta's Motion for Default Judgment. ECF No 32. Defendants have neither opposed the motion nor appeared in this case. The undersigned finds this matter suitable for disposition without oral argument and **VACATES** the November 30, 2023 hearing. Civ. L.R. 7-1(b).[2] As not all parties have consented to magistrate judge jurisdiction pursuant to 28 U.S.C. § 636(c), the undersigned requests this case be reassigned to a district judge for disposition. For the reasons stated below, the undersigned **RECOMMENDS** the District Court **GRANT** the motion.

---

[1] When this case was filed in June 2021, Facebook, Inc. was the named plaintiff. On October 11, 2022, the Court granted Plaintiff's motion to modify the case caption to reflect the corporate name change to Meta Platforms, Inc. ECF No. 20.
[2] Meta's request to appear remotely at the hearing is accordingly **DENIED** as moot.

## II. BACKGROUND

### A. Parties

Meta owns and operates Facebook and Instagram. Facebook is a social networking website and mobile application that enables its users to create their own personal profiles and connect with each other on their personal computers and mobile devices. Compl. ¶ 16, ECF No. 1. Instagram is a photo and video-sharing app. *Id.* ¶ 17.

Thêm Nguyễn, also known as "Thêm Hữu Nguyễn," is a resident of Hanoi, Vietnam. *Id.* ¶ 5. Lê Khang is a resident of Hanoi, Vietnam. Lê Khang uses multiple online aliases, including "Lạc Lối," "Lê Minh," "Nụ Cười Của Nắng," and "Niken Trần." *Id.* ¶ 6. Nguyễn Quốc Bảo is a resident of Hanoi, Vietnam. *Id.* ¶ 7. Pham Hữu Dung, also known as "Dung Ma," is a resident of Hanoi, Vietnam. *Id.* ¶ 8.

### B. Background on Facebook and Instagram

Anyone with an account can create and place ads on Facebook and Instagram. *Id.* ¶ 18. An ad account and a Facebook Page are used to run ads on Facebook and Instagram. *Id.* A Facebook Page is a public page designed for businesses, organizations, and public figures. *Id.* Only a Facebook user can create or manage a Facebook Page. *Id.*

Facebook Business Manager is a tool that helps Facebook users organize and manage multiple Facebook ad accounts and Pages and run and track advertisements. *Id.* ¶ 19. A Business Manager account is required to use the Business Manager tool. *Id.* Only a Facebook user can create a Business Manager account. *Id.* Users of a Business Manager account can have different roles, including "Employee" or "Admin." *Id.* ¶ 20. A user with Employee access to the Business Manager account can only work on ad accounts to which they are assigned. *Id.* A user with Admin or administrative access has full control of accounts that are part of the Business Manager account. *Id.* Only Facebook users with the role of Administrator can add other Facebook users to the Business Manager account. *Id.*

### C. Facebook's Terms of Service

All Facebook users must agree to its Terms of Service ("TOS") and other rules that govern access to, and use of Facebook. *Id.* ¶ 21. These include Facebook's Advertising and Page Policies

and Commercial Terms. *Id.* Among other things, the TOS prohibit users from: (1) doing anything unlawful, misleading, or fraudulent or facilitating or supporting others in doing so; or (2) accessing or collecting data from Meta's products using automated means without permission. *Id.* ¶¶ 22-23. Additionally, Facebook's Advertising Policies prohibit: (1) ads containing deceptive, false, or misleading content, including deceptive claims, offers, or methods; and (2) ads that promote products, services, schemes or offers using deceptive or misleading practices. *Id.* ¶¶ 24-25.

Defendants accepted and were bound by the TOS during all relevant times. *Id.* ¶ 26; Andre Decl. ¶ 3, ECF No. 32-2. Between November 24, 2007 and June 15, 2021, Thêm Nguyễn used and controlled at least nine Facebook user accounts, and multiple Pages, Business Manager accounts, and ad accounts. Compl. ¶ 27. Between February 11, 2015 and June 15, 2021, Lê Khang used and controlled at least five Facebook user accounts, and multiple Pages, Business Manager accounts, and ad accounts. *Id.* ¶ 28. Between March 21, 2009 and June 15, 2021, Nguyễn Quốc Bảo used and controlled at least six Facebook user accounts, and multiple Pages, Business Manager accounts, and ad accounts. *Id.* ¶ 29. Between August 13, 2011 and June 15, 2021, Pham Hữu Dung used and controlled at least six Facebook user accounts, and multiple Pages, Business Manager accounts, and ad accounts. *Id.* ¶ 30.

**D.     Defendants' Violations of Facebooks Terms of Use**

    **1.     Overview**

Beginning no later than October 2020, and continuing to at least June 2021, Defendants engaged in an account takeover scheme that targeted Meta and its users. More specifically, Defendants scheme targeted employees of advertising and marketing agencies with access to large corporate ad accounts and used those accounts to run millions of dollars in ads without the victim's knowledge or consent. *Id.* ¶¶ 1, 31. First, Defendants developed and distributed an app designed to trick victims into self-compromising their Facebook accounts. *Id.* ¶ 31a. Second, Defendants promoted the app on the Google Play Store. When a user installed the app, the user was prompted to enter their Facebook user account credentials and self-compromised their account. *Id.* ¶ 31b. Third, through the app, Defendants misappropriated users' Facebook cookies,

which include authentication information from the victim's device, and used them to take over the victim's Facebook account. *Id.* ¶ 31c. Once Defendants gained unauthorized access to a victim's Facebook account, Defendants used the account to add other unauthorized users to the victim's Business Manager account. *Id.* Those unauthorized users were given Administrator-level access to the Business Manager account, which enabled them to run ads and use existing credit lines. *Id.* Fourth, Defendants ran thousands of ads that redirected Facebook and Instagram users to various ecommerce sites. *Id.* ¶ 31d. Defendants spent at least $36 million in unauthorized advertising, which was charged to the victims' business credit lines. *Id.* Meta reimbursed Defendants' victims for Defendants' unauthorized advertising activity. *Id.*

### 2. Development, Distribution, and Promotion of the App

On or about December 28, 2020, Lê Khang developed and distributed an app named "Ads Manager" on the Google Play Store. *Id.* ¶ 32. On or about January 7, 2021, Lê Khang changed the name of the app to "Ads Manager for Facebook." *Id.* Defendants tricked victims into installing the app by misrepresenting the app on the Google Play Store, falsely portraying it as a legitimate alternative to Facebook's real Ad Manager tool. *Id.* ¶ 33. According to the Google Play Store, between December 2020 and May 2021, the app was installed more than 10,000 times. *Id.* ¶ 34.

Starting on or about December 28, 2020, Defendants ran advertisements on Facebook that promoted the app as a solution for managing and optimizing mobile ads. *Id.* ¶ 35 & Exs. 1–3. The ads were directed at users in the United States, Europe, Brazil, and India. *Id.* Between December 28, 2020 and January 2, 2021, 1,700 users clicked on an ad for Defendants' app. *Id.* ¶ 36.

After a user installed the app, they were prompted to enter their Facebook user credentials and authenticate their Facebook access. *Id.* ¶ 38. The user's credentials were communicated to Facebook's computers, which returned cookies with authentication information (collectively, "access information") for the user. *Id.* Defendants originally designed the app to send the victim's access information to a computer (Internet Protocol address 45.76.183.4) controlled by Defendants. *Id.* A version of the app published after January 2021 was designed to return the

4

victim's access information to a group chat thread on Telegram (BotID: 1493839902). *Id.* Defendants used the access information obtained from the app to access and submit requests to Facebook accounts, falsely representing themselves as the legitimate Facebook user to Facebook computers. *Id.*

For example, on or about January 21, 2021, Defendants tricked a Facebook user located in India, who had Administrator access to a Business Manager account, to install the app. *Id.* ¶ 39. Defendants then accessed the victim's Facebook account and Business Manager account, without authorization, using the access information collected through the app. *Id.*

### 3. Unauthorized Activity and Advertisements Using Compromised Accounts

Defendants used their unauthorized access to run approximately 10,000 ads on Facebook and Instagram. *Id.* ¶ 40. Defendants also offered compromised accounts for rent to other Facebook users. *Id.* ¶ 41. For example, in a March 16, 2021 post on Facebook, Defendant Pham Hữu Dung, or Dung Ma, offered users in Vietnam the ability to rent access to compromised accounts to promote products through live video ads. *Id.* The unauthorized ads promoted the sale of print-on-demand and other merchandise on third-party websites, including dragonwtee88.com, delphine.family, biglovetee.com, coolprintusa1.com, and lion-print.net, and were directed at Facebook and Instagram users around the world, including users in the United States, Europe, and Vietnam. *Id.* ¶ 42. The unauthorized ads were billed to various victims' ad accounts. *Id.* ¶ 43. In total, as a result of Defendants' scheme, Meta reimbursed victims approximately $36 million for unauthorized ads published using those accounts. *Id.*

### E. Meta's Enforcement Efforts

On June 25, 2021, Meta took various technical enforcement measures against Defendants, including disabling Facebook and Instagram accounts created or controlled by Defendants. *Id.* ¶ 45. In May 2021 Google also removed the app from the Google Play Store. *Id.*

### F. Procedural Background

On June 29, 2021, Meta filed the present complaint alleging three causes of action: (1) breach of contract, (2) violation of California's Comprehensive Computer Data Access and Fraud Act ("CCDAFA"), Cal. Penal Code § 502; and (3) violation of the Computer Fraud and Abuse Act

("CFAA"), 18 U.S.C. § 1030. Because Defendants reside in Vietnam, Meta initiated service through the Ministry of Justice of Vietnam pursuant to the Hague Convention on the Service Abroad of Judicial and Extrajudicial Documents in Civil and Commercial Matters, Nov. 15, 1965, 20 U.S.T. 361, 658 U.N.T.S. 163. Marvisi Decl. ¶¶ 2-7, ECF No. 32-3. Meta has received certificates of service from the Ministry of Justice of Vietnam, noting that a court summons was delivered to Lê Khang and Thêm Nguyễn on January 27, 2022 and January 19, 2023, respectively. ECF Nos. 21, 24; Marvisi Decl. ¶¶ 6-7. After Defendants Lê Khang and Thêm Nguyễn failed to respond to the complaint, Meta requested entry of default against them. ECF No. 25. The Clerk of Court entered their defaults on July 3, 2023. ECF No. 26.

Despite the passage of over 18 months and multiple follow-up inquiries by Meta, the Ministry of Justice of Vietnam has failed to provide any update on service on Nguyễn Quốc Bảo and Phạm Hữu Dung. Marvisi Decl. ¶ 8. Accordingly, Meta moved for entry of default against Nguyễn Quốc Bảo and Phạm Hữu Dung pursuant to Article 15 of the Hague Convention, and the Clerk entered their defaults on July 5, 2023. ECF No. 29.

Plaintiffs filed the present motion on October 20, 2023.

### III.   LEGAL STANDARD

Federal Rule of Civil Procedure 55(b)(2) permits a court, following default by a defendant, to enter default judgment in a case. "The district court's decision whether to enter default judgment is a discretionary one." *Aldabe v. Aldabe*, 616 F.2d 1089, 1092 (9th Cir. 1980).

At the default judgment stage, the factual allegations of the complaint, except those concerning damages, "together with other competent evidence submitted" are deemed admitted by the non-responding parties. *Shanghai Automation Instrument Co. v. Kuei*, 194 F. Supp. 2d 995, 1000 (N.D. Cal. 2001); *see also Fair Hous. of Marin v. Combs*, 285 F.3d 899, 906 (9th Cir. 2002) ("With respect to the determination of liability and the default judgment itself, the general rule is that well-pled allegations in the complaint regarding liability are deemed true."). "However, a defendant is not held to admit facts that are not well-pleaded or to admit conclusions of law." *DIRECTV, Inc. v. Hoa Huynh*, 503 F.3d 847, 854 (9th Cir. 2007) (citation and quotation omitted)). Therefore, "necessary facts not contained in the pleadings, and claims which are legally

insufficient, are not established by default." *Cripps v. Life Ins. Co. of N. Am.*, 980 F.2d 1261, 1267 (9th Cir. 1992) (citing *Danning v. Lavine*, 572 F.2d 1386, 1388 (9th Cir. 1978)); *accord DIRECTV*, 503 F.3d at 854. Further, the scope of relief is limited by Federal Rule of Civil Procedure 54(c), which states that a "default judgment must not differ in kind from, or exceed in amount, what is demanded in the pleadings."

In determining whether default judgment is appropriate, the Ninth Circuit has enumerated the following factors for courts to consider:

> (1) the possibility of prejudice to the plaintiff, (2) the merits of plaintiff's substantive claim, (3) the sufficiency of the complaint, (4) the sum of money at stake in the action; (5) the possibility of a dispute concerning material facts; (6) whether the default was due to excusable neglect, and (7) the strong policy underlying the Federal Rules of Civil Procedure favoring decisions on the merits.

*Eitel v. McCool*, 782 F.2d 1470, 1471-72 (9th Cir. 1986).

### IV.   DISCUSSION

**A.   Jurisdiction and Service of Process**

In considering whether to enter default judgment, a district court must first determine whether it has jurisdiction over the subject matter and the parties to the case. *In re Tuli*, 172 F.3d 707, 712 (9th Cir. 1999). "[T]he district court is not restricted to the face of the pleadings, but may review any evidence, such as affidavits and testimony, to resolve factual disputes concerning the existence of jurisdiction." *McCarthy v. United States*, 850 F.2d 558, 560 (9th Cir. 1988) (considering subject matter jurisdiction on a 12(b)(1) motion).

**1.   Subject Matter Jurisdiction**

Federal courts are courts of limited jurisdiction and are presumptively without jurisdiction. *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994). A federal court may dismiss an action on its own motion if it finds that it lacks subject matter jurisdiction. *Fiedler v. Clark*, 714 F.2d 77, 78-79 (9th Cir. 1983); *see also* Fed. R. Civ. P. 12(h)(3) ("If the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action."). The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Meta brings a claim under the CFAA. Compl. ¶¶ 71-72; *Facebook, Inc. v. Holper*, 2022 WL 17167958,

1  at *5 (N.D. Cal. Sept. 27, 2022), *report and recommendation adopted as modified*, 2022 WL
2  17169836 (N.D. Cal. Nov. 22, 2022) ("[T]he Court has subject matter jurisdiction under the
3  federal question statute, 28 U.S.C. § 1331, because Facebook asserts federal claims under the
4  Lanham Act and the CFAA."). The Court also has supplemental jurisdiction over Meta's state-
5  law claims under 28 U.S.C. § 1367 because these claims emerge from the same nucleus or set of
6  operative facts as Meta's CFAA claim. *Holper*, 2022 WL 17167958, at *5.

### 2. Personal Jurisdiction

To enter default judgment, the Court must have a basis for the exercise of personal jurisdiction over the defendants in default. *In re Tuli*, 172 F.3d at 712. "Without a proper basis for [personal] jurisdiction, or in the absence of proper service of process, the district court has no power to render any judgment against the defendant's person or property unless the defendant has consented to jurisdiction or waived the lack of process." *S.E.C. v. Ross*, 504 F.3d 1130, 1138-39 (9th Cir. 2007). Traditional bases for conferring a court with personal jurisdiction include a defendant's consent to jurisdiction, personal service of the defendant within the forum state, or a defendant's citizenship or domicile in the forum state. *J. McIntyre Mach., Ltd. v. Nicastro*, 564 U.S. 873, 880 (2011).

A defendant may consent to a court's personal jurisdiction through a forum selection clause, provided the defendant "agrees to be so bound." *Holland Am. Line Inc. v. Wartsila N. Am., Inc.*, 485 F.3d 450, 458 (9th Cir. 2007) (citations omitted). Forum selection clauses are to be specifically enforced unless the party opposing the clause clearly shows "that enforcement would be unreasonable and unjust, or that the clause was invalid for such reasons as fraud or overreaching." *Manetti-Farrow, Inc. v. Gucci Am., Inc.*, 858 F.2d 509, 512 (9th Cir. 1988) (internal quotation and citation omitted). "Courts routinely uphold forum selection clauses in form contracts between consumers and businesses." *Thomas v. Facebook, Inc.*, 2018 WL 3915585, at *4 (E.D. Cal. Aug. 15, 2018) (citing *Carnival Cruise Lines, Inc. v. Shute*, 499 U.S. 585, 587 (1991)).

Here, Defendants consented to the jurisdiction of this Court by agreeing to Facebook's TOS. *See* Andre Decl., Ex. A (providing that except for claims by consumers against Facebook,

"you agree that the claim must be resolved exclusively in the U.S. District Court for the Northern District of California or a state court located in San Mateo County, that you submit to the personal jurisdiction of either of these courts for the purpose of litigating any such claim, and that the laws of the State of California will govern these Terms and any claim, without regard to conflict of law provisions"). "With respect to [Meta's] forum selection clause, courts have held that its terms are not fraudulent or overreaching, that its enforcement would not deprive a litigant 'her day in court,' that it does not contravene public policy, or that it otherwise 'does not comport with fundamental fairness.'" *Facebook, Inc. v. ILikeAd Media Int'l Co. Ltd.*, 2022 WL 2289064, at *2 (N.D. Cal. Feb. 1, 2022), *report and recommendation adopted as modified*, 2022 WL 2289058 (N.D. Cal. Mar. 15, 2022) (quoting *Thomas*, 2018 WL 3915585, at *4); *Holper*, 2022 WL 17167958, at *6 (defendant consented to personal jurisdiction based on forum selection clause in Facebook's TOS); *Facebook, Inc. v. Sluchevsky*, 2020 WL 5823277, at *2 (N.D. Cal. Aug. 28, 2020) (same).

### 3. Service of Process

Personal jurisdiction also requires notice that is "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Mullane v. Cent. Hanover Bank & Tr. Co.*, 339 U.S. 306, 314 (1950). As discussed above, Meta initiated service on all Defendants pursuant to the Hague Convention on July 29, 2021. On January 27, 2022 and January 19, 2023, respectively, Meta received certificates of service from the Ministry of Justice of Vietnam indicating that Lê Khang and Thêm Nguyễn were properly served. ECF Nos. 21 & 24; Marvisi Decl. ¶¶ 6-7. Despite the passage of over 18 months and multiple follow-up inquiries by Meta, the Ministry of Justice of Vietnam still has not served Nguyễn Quốc Bảo and Pham Hữu Dung. Accordingly, Meta seeks default judgment under Article 15 of the Hague Convention.

To obtain a default under Article 15, Meta must show: (1) it transmitted the documents to be served pursuant to the requirements of the Hague Convention; (2) more than six months have passed without service having been effected; and (3) it has exercised diligence in attempting to obtain a certificate of service. *See* Hague Convention Art. 15; *Facebook, Inc. v. 9 Xiu Network (Shenzhen) Tech. Co.*, 2020 WL 4381649, at *1 (N.D. Cal. July 28, 2020); *Sluchevsky*, 2020 WL

9

5823277, at *5. Meta has met these requirements.

First, Meta transmitted the documents to Vietnam's central authority and requested it serve Nguyễn Quốc Bảo and Pham Hữu Dung. Marvisi Decl. ¶ 5. Second, more than six months have passed since Meta requested service – Meta requested that Vietnam's central authority serve them on March 22, 2022. *Id.* And Vietnam's central authority still has not served them. *Id.* ¶ 8. Third, Meta exercised diligence in attempting to obtain certificates of service from Vietnam's central authority. Indeed, Meta followed up diligently with Vietnam's central authority on multiple occasions, to no avail—in particular, through inquiries submitted on September 30, 2022, November 16, 2022, and December 16, 2022. *Id.* More than 18 months have passed, and Vietnam's central authority has yet to provide any status updates, despite multiple requests for the same. *Id.* At this juncture, Vietnam's failure to serve the complaint or respond to Meta's multiple inquiries warrants the entry of default judgment. *See* Hague Convention Art. 15 (authorizing default after six months); *Sluchevsky*, 2020 WL 5823277, at *5 (recommending granting default judgment where plaintiff transmitted service documents to Ministry of Justice of Ukraine more than six months before default sought and no certificate of any kind was received, despite plaintiff's service specialist contacting the ministry of justice multiple times regarding the status of service); *China Int'l Marine Containers (Grp.) Ltd. v. Jiangxi Oxygen Plant Co.*, 2017 WL 6403886, at *2 (S.D. Tex. Feb. 15, 2017) ("[A]s of the filing of their Motion, nine months had elapsed without Plaintiffs receiving any certificate from CCA—despite two inquiries into the status of service. Default judgment is, therefore, appropriate."). The undersigned finds these facts establish Meta's service efforts complied with the Hague Convention and that, under it, a default judgment may be entered.

**B.**     ***Eitel* Factors**

Applying the seven *Eitel* factors, the undersigned finds default judgment is warranted in favor of Plaintiff.

    **1.**     **The Possibility of Prejudice**

The first factor the Court considers is the possibility of prejudice if a default judgment is not entered. *Eitel*, 782 F.2d at 1471-72. This factor weighs in favor of default judgment "when a

defendant has failed to appear or defend against a suit, and the plaintiffs could not otherwise seek relief." *Vietnam Reform Party v. Viet Tan – Vietnam Reform Party*, 416 F. Supp. 3d 948, 962 (N.D. Cal. 2019) (citations omitted); *IO Grp., Inc. v. Jordon*, 708 F. Supp. 2d 989, 997 (N.D. Cal. 2010) (prejudice exists where denying the requested default judgment would leave the plaintiff without a proper remedy). Because Defendants have not appeared in this action, Meta will be unable to prevent Defendants from further violating its TOS or engaging in other disruptive conduct unless the Court grants its motion. This fact favors granting default judgment under the first *Eitel* factor.

### 2. Substantive Claims and the Sufficiency of the Complaint

The second and third *Eitel* factors focus on the merits of the substantive claims and the sufficiency of the complaint. *Eitel*, 782 F.2d at 1471-72. "These two factors are often analyzed together and require courts to consider whether a plaintiff has 'state[d] a claim on which [it] may recover.'" *Vietnam Reform Party*, 416 F. Supp. 3d at 962 (quoting *PepsiCo, Inc. v. Cal. Sec. Cans*, 238 F. Supp. 2d 1172, 1175 (C.D. Cal. 2002)). "Of all the *Eitel* factors, courts often consider the second and third factors to be 'the most important.'" *Id.* (quoting *Sanrio, Inc. v. Jay Yoon*, 2012 WL 610451, at *4 (N.D. Cal. Feb. 24, 2012)).

#### a. Breach of Contract

Under California law, the "cause of action for damages for breach of contract is comprised of the following elements: (1) the contract, (2) plaintiff's performance or excuse for nonperformance, (3) defendant's breach, and (4) the resulting damages to plaintiff." *Armstrong Petroleum Corp. v. Tri-Valley Oil & Gas Co.*, 116 Cal. App. 4th 1375, 1391 n.6 (2004).

First, valid contracts exist between Meta and Defendants. When they created Facebook accounts, Defendants agreed to Facebook's TOS. *See* Compl. ¶ 53; *In re Facebook Biometric Info. Privacy Litig.*, 185 F. Supp. 3d 1155, 1164-67 (N.D. Cal. 2016) (Meta's user-registration process created binding contract on user); *Facebook, Inc. v. 9 Xiu Network (Shenzhen) Tech. Co.*, 2021 WL 5707741, at *5 (N.D. Cal. Oct. 21, 2021), *report and recommendation adopted*, 2021 WL 5707740 (N.D. Cal. Nov. 16, 2021) ("When they created Facebook and Instagram accounts, the defendants agreed to terms of service and community standards.").

Second, Meta performed its obligations by providing access to its platform, until Meta became aware of Defendants' breach of the TOS. Compl. ¶ 54.

Third, Defendants breached the TOS, which prohibit users from doing anything unlawful, misleading, or fraudulent and accessing or collecting data from Facebook's products using automated means without permission. Compl. ¶¶ 22-23; Andre Decl., Ex. A., Section 3.2. And the Policies prohibit ads, landing pages, and business practices from containing deceptive, false, or misleading content and ads that promote products, services, schemes or offers using deceptive or misleading practices. Compl. ¶¶ 24-25. Defendants violated both by promoting a malicious app designed to self-compromise Facebook user accounts and by taking control of user accounts to run ads without the victims' knowledge or consent. *Id.* ¶¶ 55-56.

Fourth, Defendants caused Meta's damages. *Id.* ¶¶ 43, 59. Among other things, Meta expended resources to investigate, remediate, and respond to Defendants' breaching conduct. Further, Meta paid $36 million to reimburse Defendants' victims for the unauthorized ads Defendants purchased using their compromised ad accounts. *See Sluchevsky*, 2020 WL 5823277, at *7 (Meta sufficiently pled damages element of contract claim based on allegation that it incurred investigation and remediation costs as a result of breach); *9 Xiu Network (Shenzhen) Tech. Co.*, 2021 WL 5707741, at *5 (Meta sufficiently pled damages element of contract claim by alleging that it had to "expend time and resources to investigate").

Accordingly, the undersigned finds Meta has established its breach of contract claim.

### b. Computer Fraud and Abuse Act

Meta alleges Defendants violated Sections 1030(a)(4) and 1030(b) of the CFAA, 18 U.S.C. § 1030, et seq. Compl. ¶¶ 66-71. It seeks default judgment only as to the Section 1030(a)(4) claim. To state a claim under Section 1030(a)(4), Meta must allege Defendants: (1) accessed a "protected computer," (2) without authorization or exceeding such authorization that was granted, (3) "knowingly" and with "intent to defraud," and thereby (4) "further[ed] the intended fraud and obtain[ed] anything of value," causing (5) a loss to one or more persons during any one-year period aggregating at least $5,000 in value. *Facebook, Inc. v. Grunin*, 77 F. Supp. 3d 965, 971 (N.D. Cal. 2015). Upon review of Meta's complaint, the Court finds it alleges sufficient facts to

12

support each element of its Section 1030(a)(4) claim.

First, Meta's servers are "protected computers" because they are in or affect interstate or foreign commerce or communications. 18 U.S.C. § 1030(e)(2)(B). Indeed, Defendants communicated with Meta's servers across international borders. *See generally* Compl. ¶¶ 5-8, 31, 38, 68; *United States. v. Sutcliffe*, 505 F.3d 944, 953 (9th Cir. 2007) ("[A]s both the means to engage in commerce and the method by which transactions occur, the Internet is an instrumentality and channel of interstate commerce."); *Sluchevsky*, 2020 WL 5823277, at *6 (Meta "established that its HTTP servers were used in interstate commerce, and that they therefore qualify as protected computers.").

Second, even if Defendants had limited access to Meta's network (i.e., through their own personal Facebook accounts), they exceeded that access by circumventing technical barriers (i.e., password and other authentication protections) to illicitly gain access to restricted portions of Meta's network (i.e., their victims' Business Manager accounts). Compl. ¶¶ 31-40; *see ILikeAd*, 2022 WL 2289064 at *2-3 (defendants exceeded any access to Meta's network under CFAA when they "access[ed] their victims' Facebook accounts and t[ook] over their ad accounts, . . . [and] then used the accounts to run ads without the Plaintiff's users' knowledge or consent"); *Sluchevsky*, 2020 WL 5823277, at *6 (Defendant exceeded any access to Meta's network under CFAA when he "used malicious extensions and Java Script code to access and scrape Facebook's HTTP servers" and "compromised users' News Feeds, to run unauthorized ads.").

Third, Defendants knowingly exceeded their access to Meta's network with intent to defraud. As alleged in the complaint, Defendants tricked victims into installing malicious apps that Defendants used to collect the victims' authentication information. Compl. ¶¶ 31-39. Defendants then used the authentication information to access the victims' account, altered the victims' access to the account, granted other unauthorized users access to the victims' account, all for the purpose of running thousands of ads without the victims' consent. *Id.* ¶¶ 31-39, 68; *ILikeAd*, 2022 WL 2289064 at *3 (intent element satisfied on similar facts); *Sluchevsky*, 2020 WL 5823277, at *6 (same).

Fourth, Defendants obtained value from the unauthorized conduct. Compl. ¶ 46.

13

1   Specifically, Defendants ran thousands of ads worth millions of dollars using the victims'
2   accounts. *Id.* ¶¶ 31, 43.
3         Finally, Defendants caused Meta a loss of at least $5,000 during a one-year period. As
4   relevant to Meta's Section 1030(a)(4) claim, the CFAA defines "loss" as "any reasonable cost to
5   any victim." 18 U.S.C. § 1030(e)(11). As a direct result of Defendants' conduct, Meta expended
6   more than $36 million to investigate and respond to their illegal conduct and to reimburse their
7   victims for the unauthorized ads Defendants purchased—far more than the $5,000 loss required to
8   state a Section 1030(a)(4) claim. Compl. ¶¶ 43, 70-71; *see ILikeAd*, 2022 WL 2289064 at *3
9   (finding loss under 1030(a)(4) on similar facts); *Grunin*, 77 F. Supp. 3d at 972 ("Facebook
10  consequently incurred damages attributable to its efforts identifying, investigating, and removing
11  over seventy accounts associated with [defendant], and Facebook was never paid for 'more than
12  $340,000 worth of advertising' provided to [defendant]."); *Facebook, Inc. v. Power Ventures, Inc.*,
13  2017 WL 3394754, at *4 (N.D. Cal. Aug. 8, 2017) ("With respect to damages, the Ninth Circuit
14  held that '[i]t is undisputed that Facebook employees spent many hours, totaling more than $5,000
15  in costs, analyzing, investigating, and responding to [defendant's] actions.'").

      **c.**    **California's Comprehensive Computer Data Access and Fraud Act**

17        The CCDAF is the California corollary to the CFAA. *See* 5 Cal. Penal Code § 502.
18  "Since the necessary elements of [the CCDAF] do not differ materially from the necessary
19  elements of the CFAA," and given Meta's CCDAF claim is based on the same facts as its CFAA
20  claim, Meta has properly pled a claim for relief under both statutes. *Multiven, Inc. v. Cisco Sys.,*
21  *Inc.*, 725 F. Supp. 2d 887, 895 (N.D. Cal. 2010); *ILikeAd*, 2022 WL 2289064, at *4. Accordingly,
22  as Meta has established its Section 1030(A)(4) claim, default judgment is also appropriate as to its
23  CCDAFA claim.

      **3.**    **The Sum of Money at Stake in the Action**

25        Under the fourth *Eitel* factor, "the Court must consider the amount of money at stake in
26  relation to the seriousness of Defendant's conduct." *Dr. JKL Ltd., v. HPC IT Educ. Ctr.*, 749 F.
27  Supp. 2d 1038, 1050 (N.D. Cal. 2010) (citation and quotation marks omitted). When the amount
28  at stake is substantial or unreasonable in light of the allegations in the complaint, default judgment

14

is disfavored. *See Eitel*, 782 F.2d at 1472 (affirming the denial of default judgment where the plaintiff sought $3 million in damages and the parties disputed material facts in the pleadings). "However, when the sum of money at stake is tailored to the specific misconduct of the defendant, default judgment may be appropriate." *Yelp Inc. v. Catron*, 70 F. Supp. 3d 1082, 1100 (N.D. Cal. 2014).

Here, Meta seeks injunctive relief only. Accordingly, this factor favors granting default judgment. *Sluchevsky*, 2020 WL 5823277, at *8 ("Where a plaintiff seeks only injunctive relief, the fourth Eitel factor weighs in favor of granting the plaintiff's motion.") (citing *MERSCORP Holdings, Inc. v. MERS, Inc.*, 2017 WL 1709351, at *3 (N.D. Cal. May 3, 2017)).

### 4. The Possibility of Dispute Concerning Material Facts

The fifth *Eitel* factor examines the likelihood of dispute between the parties regarding the material facts surrounding the case. *Eitel*, 782 F.2d at 1471-72. However, upon entry of default, the defendant is "deemed to have admitted all well-pleaded factual allegations" in the complaint. *DIRECTV, Inc.*, 503 F.3d at 851 (citing Fed. R. Civ. P. 55(a)). Moreover, as outlined above, Meta has provided the Court with well-pleaded allegations supporting its claims. Accordingly, this factor weighs in favor of default judgment.

### 5. Whether Default was Due to Excusable Neglect

The sixth *Eitel* factor examines whether the defendant's failure to respond to the complaint was the result of excusable neglect. *Eitel*, 782 F.2d at 1471-72. Here, there is nothing in the record suggesting this failure is based on excusable neglect. Meta complied with the Hague Convention's service requirements, *see* ECF Nos. 21 & 24; Marvisi Decl. ¶¶ 5-8, yet Defendants made no appearance and failed to respond to the present motion. Thus, this factor supports default judgment. *See Sluchevsky*, 2020 WL 5823277, at *8.

### 6. Policy Favoring Deciding a Case on its Merits

The last *Eitel* factor examines whether the policy of deciding a case based on the merits precludes entry of default judgment. *Eitel*, 782 F.2d at 1472. In *Eitel*, the Ninth Circuit admonished that "[c]ases should be decided on their merits whenever reasonably possible." *Id.* "The existence of Federal Rule of Civil Procedure 55(b), however, shows that this policy is not

15

1  dispositive." *McMillan Data Commc'ns, Inc. v. AmeriCom Automation Servs., Inc.*, 2015 WL
2  4380965, at *11 (N.D. Cal. July 16, 2015) (citing *Kloepping v. Fireman's Fund*, 1996 WL 75314,
3  at *3 (N.D. Cal. Feb. 13, 1996)). Further, "deciding the case on the merits is impossible where a
4  party refuses to participate." *Vietnam Reform Party*, 416 F. Supp. 3d at 970. Thus, because
5  Defendants made no effort to respond to communication attempts by Meta Platforms, Inc. and in
6  no way participated in the proceedings, "[t]his factor thus weighs against, but does not preclude,
7  entry of default judgment." *Id.*

### 7. Summary of the *Eitel* Factors

In sum, the majority of the *Eitel* factors weigh in favor of granting default judgment. Accordingly, the undersigned **RECOMMENDS** the District Court **GRANT** the motion and enter default judgment against Defendants.

## C. Relief Sought

The Court next turns to the relief Meta seeks. Once liability is established, the plaintiff must then establish that the requested relief is appropriate. *Geddes v. United Fin. Grp.*, 559 F.2d 557, 560 (9th Cir. 1977). A "default judgment must not differ in kind from, or exceed in amount, what is demanded in the pleadings." Fed. R. Civ. P. 54(c).

Meta seeks only injunctive relief, which is authorized under both the CFAA and CCDAF. *See* 18 U.S.C. § 1030(g); Cal. Penal Code § 502(e)(1). To obtain permanent injunctive relief, "[a] plaintiff must demonstrate: (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006); *ILikeAd*, 2022 WL 2289064, at *6. The Court has discretion to grant or deny permanent injunctive relief. *eBay Inc.*, 547 U.S. at 391. The undersigned finds these factors, on balance, support issuing a permanent injunction.

### 1. Irreparable Injury

As to the first factor, "[n]umerous courts have found that unauthorized access of computers and the acquisition of data . . . constitute[s] irreparable harm." *Facebook, Inc. Power Ventures*,

252 F. Supp. 3d 765, 782 (N.D. Cal. 2017), *aff'd*, 749 F. App'x 557 (9th Cir. 2019). In *Power Ventures*, defendants' unauthorized acquisition of "data to which [d]efendants h[ad] no lawful right" violated the CFAA and § 502, and this violative acquisition constituted irreparable harm. *Id.* Here, Defendants' account takeover scheme resulted in users self-compromising their own accounts by downloading Defendants' malicious software. Meta has suffered irreparable harm, including to its reputation, goodwill, and the fundamental ability to control access to its own computers and protect its users' accounts.

### 2. Inadequacy of Money Damages

As to the second factor, the undersigned finds Meta has established that "remedies available at law, such as monetary damages, are inadequate to compensate" for the harm it has suffered regarding its ability to secure and control access to its servers and computer networks. *eBay*, 547 U.S. at 391. Meta argues monetary damages do not suffice "because Defendants easily could replicate their account takeover scheme, which largely turns on users self-compromising their own accounts by downloading Defendants' malicious software. And Meta cannot prevent users from doing so. While Meta has security measures to detect the compromise of user accounts, they are not foolproof, as evidenced by the account takeover scheme perpetrated by Defendants." Mot. at 19. "Where defendants' conduct indicates there is a 'reasonable likelihood of defendant's future violations,' . . . and defendants retain the software, tools or means at issue to continue their harmful behavior, this moves *eBay*'s second factor in favor of granting a permanent injunction." *Sluchevsky*, 2020 WL 5823277, at *9 (quoting *Pyro Spectaculars N., Inc. v. Souza*, 861 F.Supp.2d 1079, 1092 (E.D. Cal. 2012)). Absent injunctive relief, Meta may be left "prone to continued circumvention of its security measures." *Craigslist, Inc. v. Naturemarket, Inc.*, 694 F. Supp. 2d 1039, 1054 (N.D. Cal. 2010).

### 3. Balance of Hardships

As to the third factor, the balance of hardships also tips in Meta's favor. Meta "has suffered harm because of Defendants' illegal conduct, and absent a permanent injunction face the probability of Defendants again engaging in similar conduct. In contrast, a permanent injunction would only require Defendants to comply with the law. This balance, therefore, weighs in favor

of granting a permanent injunction." *Sluchevsky*, 2020 WL 5823277, at *9 (citing *Power Ventures, Inc.*, 252 F. Supp. 3d at 784 (finding the third *eBay* factor weighed in favor of granting an injunction where it would "simply serve to force [defendants'] compliance with the law") (internal quotations and alterations omitted); *Vector Media S., LLC v. Starlin Tours of Hollywood, Inc.*, 2021 WL 4913488, at *7 (C.D. Cal. Aug. 4, 2021) (rejecting contention that "merely requiring [defendant] to perform under the parties' contract is unduly burdensome" and finding that "[t]he balance of hardships therefore tips in favor of [plaintiff]").

### 4. Public Interest

"The public has an interest in ensuring that computers are not accessed without authorization." *Power Ventures, Inc.*, 252 F. Supp. 3d at 785. "Regarding Facebook specifically, courts have noted that 'Facebook's ability to decisively police the integrity of its platforms is without question a pressing public interest.'" *Sluchevsky*, 2020 WL 5823277, at *9 (quoting *Stackla, Inc. v. Facebook Inc.*, 2019 WL 4738288, at *6 (N.D. Cal. Sept. 27, 2019)). As such, the undersigned finds a permanent injunction would advance a cognizable public interest, and that this factor weighs in support of enjoining Defendants' behavior.

### 5. Injunction

For the reasons discussed above, the undersigned finds each of the factors supports granting a permanent injunction in this case. The undersigned therefore recommends the Court grant Meta's request for permanent injunctive relief against Defendants. Specifically, the Court should enjoin Defendants and their officers, agents, servants, employees, and attorneys, and all other persons acting in concert, or participation with Defendants, from:

(a) Accessing or attempting to access Meta's platforms and computer systems;

(b) Engaging in any activity that disrupts, diminishes the quality of, interferes with the performance of, or impairs the functionality of Meta's platforms and computer system, including developing malware that targets Facebook; and

(c) Engaging in any activity, or facilitating others to do the same, that violates Meta's Terms.

## V. CONCLUSION

For the reasons stated above, the undersigned **RECOMMENDS** the District Court **GRANT** Plaintiff Meta Platforms, Inc.'s motion for default judgment and enter judgment against Defendants Thêm Nguyễn, Lê Khang, Nguyễn Quốc Bảo and Pham Hữu Dung. The undersigned **FURTHER RECOMMENDS** the Court **GRANT** Meta's request for a permanent injunction as follows:

Defendants and their officers, agents, servants, employees, and attorneys, and all other persons acting in concert, or participation with Defendants, be permanently enjoined from:

(a) Accessing or attempting to access Meta's platforms and computer systems;

(b) Engaging in any activity that disrupts, diminishes the quality of, interferes with the performance of, or impairs the functionality of Meta's platforms and computer system, including developing malware that targets Facebook; and

(c) Engaging in any activity, or facilitating others to do the same, that violates Meta's Terms.

Meta shall serve a copy of this Report and Recommendation upon Defendants and file proof of service thereafter. Pursuant to 28 U.S.C. § 636(b)(1) and Federal Rule of Civil Procedure 72(b)(2), a party may serve and file any objections within 14 days after being served. Failure to file objections within the specified time may waive the right to appeal the district court's order.

**IT IS SO RECOMMENDED.**

Dated: November 21, 2023

THOMAS S. HIXSON
United States Magistrate Judge